# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 29
In the Matter of the Claim of
Thomas Johnson,
  Appellant,
   v.
City of New York,
  Respondent.
Workers' Compensation Board,
  Respondent.

----------------
No. 30
In the Matter of the Claim of
Joseph D. Liuni,
  Appellant,
   v.
Gander Mountain et al.,
  Respondents.
Workers' Compensation Board,
  Respondent.


Case No. 29:

Robert E. Grey, for appellant.
Daniel Matza-Brown, for respondent City of New York.
Brian D. Ginsberg, for respondent Workers' Compensation Board.
Injured Workers' Bar Association and New York State AFL-CIO, amici curiae.

Case No. 30:

Justin S. Teff, for appellant.
Jeffrey M. Fox, for respondents Gander Mountain et al.
Brian D. Ginsberg, for respondent Workers' Compensation Board.

CANNATARO, J.:

The common issue in these appeals is whether, under Workers' Compensation Law (WCL) § 15, a claimant's schedule loss of use (SLU) award must always be reduced by the percentage loss determined for a prior SLU award to a different subpart of the same body "member" enumerated in section 15. We hold that separate SLU awards for different injuries to the same statutory member are contemplated by section 15 and, when a claimant

- 1 -

proves that the second injury, "considered by itself and not in conjunction with the previous disability" (WCL § 15 [7]), has caused an increased loss of use, the claimant is entitled to an SLU award commensurate with that increased loss of use.

I.

*Matter of Johnson v City of New York*

Claimant Thomas Johnson, a patient care technician, suffered work-related injuries to both of his knees in 2006 while employed by respondent City of New York (the City). His claim for workers' compensation benefits was established but the SLU award for the injury to his knees was not made until after he sustained a second injury and an SLU award had been made for the subsequent injury. In the second workplace accident, which occurred in 2009, Johnson injured both of his hips. Johnson was awarded, as relevant here, a 50% SLU of his left leg and 52.50% SLU of his right leg as a result of the 2009 injuries.

Johnson thereafter reached maximum medical improvement with regard to the 2006 knee injuries. He submitted medical evidence regarding the permanency of his injuries, including a report from his expert, who was also his treating physician, opining that Johnson sustained an 80% SLU of his left leg and a 40% SLU of his right leg. Johnson's expert later testified that the knee injuries did not exist in isolation from the hip injuries. Although Johnson's expert acknowledged that it was fair to say, under the guidelines, that Johnson had suffered a 130% loss of use of his left leg and 92% loss of use of his right leg due to the separate injuries, the expert refused to opine as to whether those numbers translated to the actual loss of use for the legs.

The Workers' Compensation Law Judge (WCLJ) ultimately credited the opinion of Johnson's expert on the degree of impairment caused by the knee injuries, determining that Johnson had an 80% loss of use of his left leg and a 40% loss of use of his right leg. The WCLJ concluded, however, that the then-recent decision in *Matter of Genduso v New York City Dept. of Educ.* (164 AD3d 1509 [3d Dept 2018]) required that any SLU awards based on the knee injuries be offset by the previously awarded SLU for each leg in connection with his hip injuries. The WCLJ reduced the 80% SLU of the left leg by 50% to account for the prior SLU award for that leg and reduced the 40% SLU of the right leg by the prior 52.50% SLU awarded for that leg, leaving Johnson with an "additional" SLU award of 30% for the left leg and 0% for the right leg.

The Workers' Compensation Board affirmed, concluding that Johnson's injuries to the hips and knees were both encompassed "by a leg schedule," such that the second SLU award for the legs must be reduced by his prior SLU award for the legs, regardless of which subpart of the leg was injured. Upon Johnson's appeal, the Appellate Division affirmed (180 AD3d 1134 [3d Dept 2020]). The Court reasoned that separate SLU awards for a member's subparts are not authorized by the statute and would amount to a monetary windfall that would compensate claimants beyond the degree of impairment actually sustained to the statutorily enumerated member (*see id.* at 1136-1137). This Court granted Johnson's motion for leave to appeal.

### *Matter of Liuni v Gander Mountain*

Claimant Joseph D. Liuni also sustained successive work-related injuries to different subparts of the same body member enumerated in Workers Compensation Law

§ 15 (3). Liuni first injured his left elbow in 2007, for which he received an SLU award of 22.5% for his left arm. After a 2014 accident, Liuni developed a consequential injury to his left shoulder. His expert, a consulting physician, opined that Liuni had a 20% SLU of his right arm and a 27.5% SLU of his left arm due to the 2014 injury. The expert opined that, in light of the previous 22.5% SLU award for his left arm, "Liuni warrants a total of 50% [SLU] of the left arm associated with both of his injuries," with 22.25% attributable to the 2007 injury and 27.5% related to his 2014 injury. At his subsequent deposition, the expert elaborated that the impairments to Liuni's left arm "shouldn't be subsumed or combined," because "they were separate both in terms of dates of injury and in terms of findings on physical examination," and that the two injuries were "completely separate pathologies" that were "not in any way related."

Consistent with the expert's testimony, the WCLJ determined that Liuni had a 20% SLU of the right arm and an "overall 50% SLU of the left arm, which is an increase of 27.5% overall." The Board, however, modified the WCLJ's decision, concluding that Liuni had a 5% SLU of the left arm, for an overall left arm SLU of 27.5%. Although the Board credited the opinion of Liuni's expert that the second accident resulted in a 27.5% SLU of his left arm, it concluded that the two SLU awards for the left arm could not be treated as separate under *Genduso*.[1] The Appellate Division affirmed (188 AD3d 1403 [3d

---

[1] Contrary to the representations of the dissent, Liuni acknowledges in his brief before us that the Court in *Genduso* "likely reached the proper result," and the Attorney General, representing the Board, would have equal reason for surprise at the dissent's claim that she contends the affirmance of the Board's determination in *Genduso* was wrongly decided. In any event, Liuni correctly explains *Genduso* is distinguishable from his case because there was a finding in *Genduso* that the impairments to the claimant's knee were

Dept 2020]).  The Court reasoned, as in *Johnson*, that separate SLU awards for a member's subparts are not authorized—i.e., the elbow and shoulder are not enumerated as separate body members in the statute but encompassed by the arm—and concluded that the SLU awards arising from the two injuries were both encompassed by awards for the loss of use of the left arm (*see id.* at 1404-1405).  This Court granted Liuni's motion for leave to appeal.

## II.

The WCL establishes four classifications of disability:  (1) permanent total, (2) temporary total, (3) permanent partial, and (4) temporary partial (*see* WCL § 15 [1]-[3], [5]; *Matter of LaCroix v Syracuse Exec. Air Serv., Inc.*, 8 NY3d 348, 353 [2007]).  "[T]he claimant generally has the burden in the first instance of proving facts sufficient to support [a] claim for compensation" for the disability (*Matter of Kigin v State of New York Workers' Comp. Bd.*, 24 NY3d 459, 468 [2014]).  Claimants who suffer a permanent partial disability, like Johnson and Liuni, "typically qualif[y] for one of two broad categories of primary award under WCL [§] 15 (3)—referred  to colloquially as a 'schedule loss of use' award or a 'non-schedule' benefit—depending on the nature of the injury" (*Mancini*, 32 NY3d at 525).  SLU awards are "compensation allowed for specified permanent partial disabilities in which the loss or the loss of use of a member of the body listed in [WCL § 15 (3)] has occurred" (*Mancini*, 32 NY3d at 526 n [internal quotation marks and citation

---

"inclusive" of impairments covered by prior SLU awards (*see Employer: NYC Dept. Educ.,* 2017 WL 667430, *2 [WCB No. G101 3459, Feb. 10, 2017]).  Given that distinction, our decision herein should not be interpreted as overruling the Appellate Division decision in *Genduso* sub silentio.

omitted]; *see Matter of Estate of Youngjohn v Berry Plastics Corp.*, 36 NY3d 595, 599 [2021]).  For SLU awards, WCL § 15 (3) "'assigns—as by a "schedule"—a fixed number of lost weeks' compensation according to the bodily member [or sensory organ] injured'" (*Mancini*, 32 NY3d at 526, quoting *LaCroix*, 8 NY3d at 353).[2]  An SLU award is calculated by multiplying a percentage of the employee's weekly wages by the number of weeks specific to the enumerated member that is injured (*see Youngjohn*, 36 NY3d at 599-600). The purpose of an SLU award is to compensate for loss of earning power, rather than the time that an employee actually loses from work or the injury itself (*see id.* at 600; *Matter of Landgrebe v County of Westchester*, 57 NY2d 1, 6 [1982]).

The members currently listed in the statutory schedule include the arm and leg, but knees, hips, elbows and shoulders are not separately listed (*see* WCL § 15 [3]).  It is undisputed that impairments to those subparts of the arm and leg are encompassed by SLU awards for the loss of use of the arm or leg.  WCL § 15 (3) (r) provides that compensation for total loss of use is the same as for loss of a member, and section 15 (3) (s) provides that compensation for "[p]artial loss or partial loss of use" of a member is based on the "proportionate loss or loss of use of the member."  As relevant here, WCL § 15 (3) (u) also provides that "[i]n any case in which there shall be a loss or loss of use of more than one member or parts of more than one member set forth in . . . this subdivision but not

---

[2]  For non-schedule, permanent partial disabilities that are not caused by injury to the body members listed in WCL § 15 (3), "[p]aragraph w . . . specifies the number of weeks the worker will receive [a] weekly sum, based on the percentage of lost wage-earning capacity. For example, the number of weeks that benefits may be received is capped at 525 where the loss of earnings is greater than 95%" (*Mancini*, 32 NY3d at 526; *see* WCL § 15 [3] [w] [i]).

amounting to permanent total disability, the board shall award compensation for the loss or loss of use of each such member or part thereof."[3]

In determining the extent to which SLU awards for successive injuries to the same enumerated member must be offset, we are presented with a question of pure statutory interpretation, the starting point for which "must always be the [statutory] language itself, giving effect to the plain meaning thereof" (*Majewski v Broadalbin–Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998]). Inasmuch as the provisions of WCL § 15 constitute "an integrated statutory scheme," they "must be considered as a whole, with each component viewed in relation to the others" (*Matter of Mancini v Office of Children & Family Servs.*, 32 NY3d 521, 525 [2008]; *see* McKinney's Cons Laws of NY, Book 1, Statutes § 97, Comment at 213–214, 216 ["(W)ords, phrases, and sentences of a statutory section should be interpreted with reference to the scheme of the entire section . . . and the meaning of a single section may not be determined by splitting it up into several parts"]).

WCL § 15 (3) plainly contemplates SLU awards based on the loss of use of the relevant "member," not awards based on injuries to the various subparts of such "members." At the same time, section 15 also expressly provides that claimants may receive additional awards, subject to certain limitations, if more than one workplace accident occurs. In particular, WCL § 15 (3) must be read in the context of section 15 (7),

---

[3] To the extent that claimants argue that WCL § 15 (3) (u), in itself, allows separate SLU awards for injuries to different unenumerated subparts of an enumerated body member, they are incorrect. Section 15 (3) (u) permits separate awards for loss of use of more than one member or parts of more than one member, not multiple parts of the same enumerated member. In each of these cases, only one enumerated body member is involved and subdivision (u) is therefore inapplicable by its terms.

which governs in cases, such as these, involving successive awards for separate injuries to

the same member.  WCL § 15 (7) states:

> "Previous disability. The fact that an employee has suffered
> previous disability or received compensation therefor shall not
> preclude [the employee] from compensation for a later injury
> nor preclude compensation for death resulting therefrom; but
> in determining compensation for the later injury or death his
> average weekly wages shall be such sum as will reasonably
> represent [the employee's] earning capacity at the time of the
> later injury, provided, however, that an employee who is
> suffering from a previous disability shall not receive
> compensation for a later injury in excess of the compensation
> allowed for such injury when considered by itself and not in
> conjunction with the previous disability except as hereinafter
> provided in subdivision eight of this section."[4]

This Court has interpreted section 15 (7) as

> "specify[ing] that (1) a previous disability does not disqualify
> an employee from receiving compensation benefits for a later
> work-related injury . . . ; (2) the measure of compensation . . .
> in this situation is the employee's earning capacity at the time
> of the later work-related injury, which would necessarily
> reflect any diminished earning capacity due to the previous
> disability; and (3) generally, the employee shall not receive
> compensation benefits in excess of those allowed for the later
> work-related injury considered by itself, which insures that the
> award is based solely on the diminished earning capacity
> attributable to the later injury rather than from all disabilities"

(*Matter of Hroncich v Con Edison*, 21 NY3d 636, 645 [2013]).

Thus, section 15 (7) provides that a claimant may receive more than one SLU award

in connection with successive injuries to the same statutory body member enumerated in

section 15 (3).  But section 15 (7) also imposes limits on a subsequent award.  Specifically,

---

[4] The parties are in agreement that the provisions of WCL § 15 (8) are not at issue here.

the statute mandates that the wage rate used in calculating the subsequent SLU award must measure "any diminished earning capacity due to the previous disability" and that "generally" the award should not exceed the benefits "allowed for the later work-related injury considered by itself" (*Hroncich*, 21 NY3d at 645). These statutory requirements "insure[] that the [subsequent] award is based solely on the diminished earning capacity attributable to the later injury rather than from all disabilities" (*id.*). [5] This is in keeping with the purpose of an SLU award, which "is to compensate for loss of earning power" that results from the diminished use of a statutorily enumerated member (*LaCroix*, 8 NY3d at 353 [internal quotation marks and citation omitted]). In short, the limitations set forth in WCL § 15 (7), taken together, mandate that awards for successive injuries to subparts of the members set forth in section 15 (3) be limited to the loss of earning power caused by the second injury.[6]

Finally, although claimants are correct that this Court's decision in *Matter of Zimmerman v Akron Falls Park—Erie County* (29 NY2d 815 [1971]) is relevant to the issues raised on this appeal, their reading of that case misses the mark. In *Zimmerman*, the

---

[5] Contrary to the suggestion of the dissent, nothing in the text of WCL § 15 (7)—which more broadly dictates that compensation for an injury shall not be in excess of the compensation allowed for such injury when considered by itself—limits that provision to instances in which employers may otherwise be held liable for permanent total disability. Nor does *Schurick v Bayer Co.* support the dissent's contention inasmuch as that case did not involve successive SLU awards (272 NY 217, 218 [1936]).

[6] Claimants contend that the directive in WCL § 15 (7) that compensation may not be awarded in excess of that allowed "for such injury when considered by itself and not in conjunction with the previous disability" is not a limitation on successive awards. That contention cannot be reconciled with either the express language on which they rely or with the requirement in subdivision (7) that compensation for an additional injury must take into account any prior loss of earning power.

claimant received separate SLU awards for a 1924 amputation of his hand, and a 1967 injury to his arm, specifically the shoulder (*Zimmerman*, 35 AD2d 1030, 1030 [3d Dept 1970]). The Workers' "Compensation Law in effect in 1924 . . . authorized benefits for [the] claimant's injury only for the loss of his hand (Workmen's Compensation Law, § 15, subd. 3, par. o [1924]), and . . . the 1924 award was only for the loss of a hand" (*Zimmerman*, 35 AD2d at 1031 [Herlihy, J. dissenting]).[7] The 1967 award, in contrast, was for "a 50% [SLU] of the left arm" (*id.* at 1030)—a separately enumerated member (*see* Workers' Compensation Law § 15 (3) (a), (c)—and the claimant was left more severely disabled after the 1967 accident, which caused "a separate and distinct injury" (*Zimmerman*, 35 AD2d at 1031 [Herlihy, J. dissenting]).

This Court held that it was not necessary to reduce the 1967 award for the injury to the claimant's left arm by the 1924 award for his forearm amputation because the "[c]laimant's 1924 accident did not affect his left shoulder which was injured in the 1967 accident causing the 50% loss of use of the left arm" (29 NY2d at 817 [internal quotation

---

[7] In 1924, former Workmen's Compensation Law § 15 (3) (o) provided: "Amputated arm or leg. Compensation for an arm or a leg, if amputated at or above the elbow or knee, shall be the same as for loss of the arm or leg; but, if amputated between the elbow and the wrist or the knee and the ankle, shall be the same as for loss of a hand or foot." This Court concluded that substantial evidence supported the Board's determination that the claimant in *Zimmerman* suffered a "50% loss of use of his arm attributable solely to the 1967 accident . . . in view of the restricted motion of the left shoulder and in spite of the prior left *forearm amputation*" (29 NY2d at 817 [internal quotation marks omitted; emphasis added]). The Appellate Division noted that, for the amputation, the "claimant was awarded a schedule loss of 80% of his left arm for loss of his left hand and forearm six inches below the elbow" (35 AD2d at 1030). We note the Board's current Impairment Guidelines similarly provide that "[a]mputation at the wrist equals 100% loss of use of the hand (80% loss of use of the arm)" (*see* Workers' Compensation Guidelines for Determining Impairment, First Edition, November 22, 2017, at 25 [2017]).

marks and citation omitted]).   In essence, offset was unnecessary because there was evidence that the amputation addressed in WCL § 15 (3) (o) did not affect the claimant's shoulder, which was addressed in the separate subdivision (a) of section 15 (3). Specifically, "[t]here was substantial medical evidence that claimant suffered a 50% loss of use of his arm attributable solely to the 1967 accident" (*id.*).  *Zimmerman* therefore does not provide support for claimants' argument that SLU awards for successive injuries to different subparts of the same enumerated body member may never be offset.  Rather, it establishes that offset is not required when the claimant demonstrates that a subsequent injury increased the loss of use of a body member beyond that resulting from the prior injury.

## III.

Here, each claimant had the opportunity to present evidence regarding the degree of loss of use attributable solely to the accident in question.   Because Liuni submitted evidence regarding the loss of use of his left arm that was attributable solely to the injury to his shoulder and demonstrating that the second injury resulted in a greater degree of loss of use of the body member in question, reversal and remittal to the Board to make an SLU award in light of that evidence is warranted.  Because Johnson did not submit any such evidence, the Appellate Division order in his case must be affirmed.

Johnson's expert, whom the WCLJ credited, declined to offer an opinion on the question of whether the injury to Johnson's knees caused a further loss of use of his legs in addition to the loss that was addressed in the first SLU award.  In fact, despite the initial conclusion of the City's orthopedic consultant that there was no further injury to the hips

as a result of the knee injuries, Johnson's expert testified that the knee and hip injuries were not isolated from one another, leaving it unclear whether any or how much loss of use of Johnson's legs was solely related to his knee injuries. The Board was entitled to credit that testimony.[8]

In contrast, Liuni *did* offer evidence that the injuries to his elbow and shoulder were separate pathologies that each individually caused a particular amount of loss of use of his arm. Specifically, his expert testified that Liuni's later injury constricted the range of motion in his shoulder by 27.5% and that this loss of use was based solely on findings related to shoulder. The prior 22.5% loss of use of the arm was based solely on findings at the elbow and the expert testified that those impairments "shouldn't be subsumed or combined" in determining the loss of use because the impairments were "completely separate" and "not in any way related." Overall, the expert explained, claimant had a 50% loss of use of his arm, with 27.5% of that loss attributable solely to the later injury. Although Liuni's employer attacked the credibility of the expert's testimony, stating that it was not based on an examination of the separate sites but a simple assertion that the two injuries were separate, credibility determinations are within the sole province of the Board (*see Matter of Axel v Duffy-Mott Co.*, 47 NY2d 1, 8 [1979]).

---

[8] Contrary to Johnson's argument, the fact that the Board's guidelines for determining impairment provide for separate assessment of the knee and hip joints (*see* New York State Guidelines for Determining Permanent Impairment and Loss of Wage Earning Capacity, at 25-26 [2012]) does not overcome Johnson's failure to meet his burden of demonstrating entitlement to compensation (*see Kigin*, 24 NY3d at 468), particularly given that the statute does not separately enumerate the hips and knees.

IV.

In sum, in *Johnson*, the claimant failed to adduce evidence sufficient to permit the Board to determine the degree of impairment to his legs caused solely by his knee injury and, thus, the degree of any increased loss of use to that member due to that particular injury. Therefore, the Board's decision to reduce the SLU awarded to Johnson for his knees by the prior SLU award for his legs was not irrational. In *Liuni*, however, reversal is warranted—as the Board and City, as employer, concede—to permit the Board to consider the extent to which, if any, the evidence indicated that claimant's second injury resulted in an increased loss of use of his left arm.

Accordingly, in *Johnson*, the order of the Appellate Division should be affirmed, with costs. In *Liuni*, the order should be reversed, with costs, and the matter remitted to the Appellate Division, Third Department, with directions to remand to the Workers' Compensation Board for further proceedings in accordance with this opinion.

WILSON, J. (dissenting):

I agree that a reversal is required in *Liuni* and disagree with the affirmance in *Johnson*. In short, the proper result in both cases should be to expressly disavow the legal test set forth in *Genduso v New York City Department of Education* (164 AD3d 1509 [3d Dept 2018]), on which the Workers' Compensation Board based both decisions appealed

- 1 -

here; set out the correct legal standard; and remit to the Board to determine the awards under the correct legal standard. Instead, the majority: (i) *sub silentio* overrules *Genduso*; (ii) affirms the denial of any award to Mr. Johnson for the work-related injury he suffered— even though his employer conceded that he was entitled to an award for that injury; and (iii) sets out, in what is pure *dicta*—wholly unnecessary to its holding in either case—an erroneous interpretation of *Matter of Zimmerman v Akron Falls Park—Erie County* (29 NY2d 815 [1971]).

I

The Appellate Division's central error in *Johnson* and *Liuni* was the Board's reversal of the awards to Messrs. Liuni and Johnson based on the controlling and erroneous legal standard set out in *Genduso*. In *Genduso*, the claimant had sustained two prior work-related injuries to his right leg: a 1997 injury to his right ankle and right knee, for which he was awarded a 20% SLU of the right leg, and a 1999 injury to his right knee, for which he was awarded a 12.5% SLU of the right leg attributable to the second injury (164 AD3d at 1509). At issue was the proper SLU amount for a third work-related injury to his right knee sustained in 2013 (*id.*). The WCLJ credited the testimony of the claimant's expert and awarded claimant a 40% SLU of the right leg in accordance with that testimony (*id.*). The WCLJ, however, then proceeded to deduct the previous 20% and 12.5% SLU awards and ultimately awarded claimant an award reflecting a 7.5% SLU of the right leg attributable to the 2013 injury, and the Board affirmed (*id.*).

The Appellate Division also affirmed, reasoning that WCL § 15 (3) did not "list[]" the ankle or the knee as body parts lending themselves to separate SLU awards" but rather "impairments to these extremities are encompassed by awards for the loss of use of the leg" and thus "[i]nasmuch as the 20% SLU award granted with respect to claimant's 1997 injury was for the loss of use of his right leg, it was not improper for the Board to deduct it from the 40% SLU award that it found applicable to claimant's 2013 injury in arriving at the final SLU award of 7.5% (*id.* at 1510).

Here, the Board, constrained by *Genduso*, required the deduction of the percentage loss from each claimant's prior award from his second award. In Mr. Liuni's case, the Board held "that *Matter of Genduso* applies to the instant case," and therefore deducted the loss of use determined for Mr. Liuni's first workplace injury from the loss of use determined in his second. In Mr. Johnson's case, the Board held "that *Genduso* is on point with the exact issue in the present case . . . [and therefore] the claimant's currently awarded schedule losses of use must be reduced by the prior schedule losses of use."

The Attorney General, representing the Board, contends *Genduso* was wrongly decided (*see* New York State Court of Appeals, *No. 29 Matter of Johnson v City of New York / No. 30 Matter of Liuni v Gander Mountain*, Oral Argument of Brian D. Ginsberg, Assistant Solicitor General Of Counsel, on behalf of the Workers' Compensation Board, YouTube at 19:58 [Mar 17, 2022], https://www.youtube.com/watch?v=OC0J_Fb1Sco&t=1198s ["Again, we're asking for a new legal rule. No question about that. . . . I think we all agree that in *Liuni*, there would have to be a vacate and remit to the Board to be properly instructed to apply these case-by-

case rules that I just set forth as opposed to the categorical rule of *Genduso*"]). Mr. Johnson contends *Genduso* was wrongly decided. Mr. Liuni politely offers that although the Third Department in *Genduso* "likely reached the proper result" in that case, *Genduso*'s language and reasoning has "fashioned a new black-letter rule that injuries to different joints within a single extremity may never be separately compensated as a matter of law," which has "produce[d] unsound results which are contrary to the humanitarian purpose and intended construction of New York's Workers' Compensation" (*see* Appellant's Br 19, 23 [May 13, 2021], https://www.nycourts.gov/ctapps/courtpass/Docket.aspx [Enter "Liuni" for "Party Name"; click "Select" next to "Matter of Liuni v Gander Mountain"; click "APL-2021-00053" hyperlink; click "Select" for file "LiunivGanderMountain-app-Liuni-brf"]; *see also id*. at 17 ["*Genduso* was itself a fact-specific decision, and the notion of arbitrarily subsuming one loss of use within another in every case of multiple joint injuries actually represents a misapprehension of the Board's determination"]). In holding that Workers' Compensation Law (WCL) § 15 allows for separate SLU awards for distinct injuries to the same statutory member, the majority has agreed, overruling *Genduso* without expressly saying so.[1] I agree with the majority that *Genduso*'s automatic deduction of a prior SLU award from a subsequent SLU award for an injury to the same enumerated body member

---

[1] The majority notes that *Genduso* constrained the awards for Mr. Johnson and Mr. Liuni, because *Genduso* held that "separate SLU awards for a member's subparts are not authorized" (majority op at 3, 5). The majority later holds, without mentioning *Genduso*, that "section 15 also expressly provides that claimants may receive additional awards, subject to certain limitations, if more than one workplace accident occurs" (*id.* at 7). Our colleagues in the Appellate Division are not so thin skinned that they need this degree of sugar coating, and litigants would be served by a forthright statement from our Court.

has no basis in the text of WCL § 15 (7).  When, as here, an agency has issued a decision

under an incorrect legal standard, our job is to correct the legal standard and remit to the

agency for determination under the correct legal standard (*see, e.g.*, *Meyer v McGuire*, 64

NY2d 1152 [1985]). Both Mr. Liuni's award and Mr. Johnson's award expressly rested on

an incorrect legal standard.  The majority remits Mr. Liuni's award for the Board to

redetermine, but does not do so for Mr. Johnson's, choosing instead to redetermine it here.[2]

We should not do so.


                                                  II


    *Second*, given the majority's disposition of these appeals, its discussion of *Matter

of Zimmerman v Akron Falls Park—Erie County* (29 NY2d 815 [1971]) is *dicta*; calling its

discussion "relevant" (majority op at 9) does not make it so.  The majority's decisions here

would be no different if *Zimmerman* did not exist.  In *Zimmerman*, the claimant sustained

an injury in 1924 that resulted in a "left forearm amputation" for which he had received an

SLU award for 80% loss of use of the left arm (29 NY2d at 819).  Later, in 1967, the

---

[2] It is hardly clear that Mr. Johnson's expert, Dr. Long, failed to give an opinion based solely on the loss of use caused by Mr. Johnson's knee injuries—the basis on which the majority denies Mr. Johnson recovery.  Although Dr. Long acknowledged that several of Mr. Johnson's ailments interacted, he also testified: "40 percent is the knee but it's affecting the other joints"; Mr. Johnson's hip ailment "does not affect my opinion of his knees"; "I'm providing the schedule loss of use for the extremity under examination today"; and "I've been asked a very specific issue related to a very specific joint and I'm providing you the best of my ability to answer that." Why we would take it on ourselves to make a factual determination that Dr. Long's testimony was not isolated to the knees— particularly when the WCLJ found that it was but reversed the award solely because of *Genduso*—is very hard to square with our consistent pronouncements that we are powerless to resolve disputed factual issues.

claimant injured his left shoulder, and our Court affirmed an additional 50% SLU award "for loss of use of his [left] arm attributable solely to the 1967 accident" (*id*.). There is no question that Zimmerman received awards totaling 130% for workplace injuries to his left arm. The sum of the awards for Mr. Johnson's successive injuries to his left leg exceeded 100%, and the parties in *Johnson* dispute whether *Zimmerman* permits an award of greater than 100%. However, that issue is absent in Mr. Luini's case, because the sum of his successive injuries totaled only 50%. Thus, in Mr. Liuni's case, the circumstances in which *Zimmerman* permits successive award to total more than 100% is not raised.

Mr. Johnson's case does raise that issue because for his left leg (but not his right), the sum of the awards exceeded 100%. However, the majority does not deny Mr. Johnson recovery on that ground. Instead, the majority denies Mr. Johnson any compensation for his *first* workplace injury to his legs because of a failure of proof: "Johnson's expert testified that the knee and hip injuries were not isolated from one another, leaving it unclear whether any or how much loss of use of Johnson's legs was solely related to his knee injuries" (majority op at 12). Thus, *Zimmerman* is irrelevant to the majority's holding in Mr. Johnson's case as well: the circumstances in which a claimant may recover more than 100% loss of use for a leg, or even whether a deduction should be made from a current award based on a prior award, is not present in Mr. Johnson's case given the majority's holding that Mr. Johnson failed to tender evidence showing the degree of loss of use that resulted from his first workplace accident.

III

For two reasons, Mr. Johnson should be able to receive an award for the injuries to his knees or, at least as a minimum, should have his case remitted to the Board for determination now that *Genduso*—on which the Board's denial of his claim was based— has been swept aside.

A

The simplest basis on which I disagree with the majority's disposition as to Mr. Johnson's appeal is that his employer, the City of New York, conceded that he had a compensable loss of use resulting specifically from the injuries to both of his knees. The City engaged an expert, Dr. Parisien, to examine Mr. Johnson. Dr. Parisien concluded that, as a result of the injury to Mr. Johnson's knees from his initial workplace accident, Mr. Johnson had suffered "a 27.5% causally related schedule loss of use of the right leg and a 40% causally related schedule loss of use of the left leg." Although it is true that the WCLJ determined that Mr. Johnson's expert's higher loss-of-use figures were preferable to Dr. Parisien's, there is no finding that Dr. Parisien's loss-of-use determinations were incredible or so lacking in foundation as to be unreliable. Moreover, at oral argument, counsel for the Board agreed that Dr. Parisien's estimates would support an SLU award under the proper legal test.

Not much legal analysis is needed here: the Board denied Mr. Johnson's claim solely and expressly by applying the erroneous legal standard created by *Genduso*. The Board has consistently argued that *Genduso* is wrong, and the majority so holds (and I

agree).   The Board further agrees that record evidence, in the form of Dr. Parisien's report and testimony, would support an SLU award for Mr. Johnson's knee injuries under the correct legal standard.  Before the WCLJ and Board, the City never argued that Mr. Johnson should get nothing for his knee injuries—rather, it argued that he should receive just not as great an amount as he sought.  Yet Mr. Johnson now winds up with nothing.  "As a remedial statute serving humanitarian purposes, the Workers' Compensation Law should be liberally construed" (*Burns v Robert Miller Constr., Inc.*, 55 NY2d 501, 508 [1982]).  Try convincing Mr. Johnson of that after today's decision.


B


The second reason I disagree as to Mr. Johnson's appeal is more complex and more important.  The majority's *dicta* about *Zimmerman* is wrong.  Properly understood, WCL § 15 (7) together with *Zimmerman* entitle Mr. Johnson to an SLU award in the amount he sought or, at a minimum, a remittal based on a proper interpretation of the WCL and *Zimmerman*.

If you lose your arm in a workplace accident, you receive a 100% SLU for loss of your arm.  That makes sense.  Intuitively, one might conclude that a person can never have a greater than 100% loss of use of an arm, but *Zimmerman* clearly holds otherwise: Mr. Zimmerman received SLU awards totaling 130% loss of use of his left arm.  Why should a worker like Mr. Zimmerman, who lost his forearm and hand in one accident and then injured his shoulder in another, have a 130% loss of use of his left arm, while a worker who loses an entire arm in a single workplace accident recover only 100%?  The answer

lies in the purpose and history of the Workers Compensation Law, in the statutory language, and in *Zimmerman* itself.

The Commission Appointed Under Chapter 518 of the Laws of 1909 to Inquire into the Question of Employers' Liability and Other Matters, known as the "Wainwright Commission," issued its first report in 1910. It observed that employers generally "pay less attention to the prevention of accidents than the public interest demands because the payment for the damages of accident bears very little direct relation under the present system of liability, to the number of accidents," concluded that "the present system in New York rests on a basis that is economically unwise and unfair," and proposed legislation establishing a workers' compensation system—the first in the United States (Report to the Legislature of the State of New York by the Commission appointed under Chapter 518 of the Laws of 1909 to inquire into the question of employers' liability and other matters, First Report, March 19, 1910 at 7, 68 ["First Wainwright Report"]; *see generally* John Fabian Witt, The Transformation of Work and the Law of Workplace Accidents, 1842-1910, 107 Yale L J 1466 [1997]). The Wainwright Commission chronicled in detail the proliferation of workplace accidents resulting from the transformation to an industrial society and explained that "the changes in the liability laws which we recommend, because they tend to make the employer pay something for every accident, will have a real effect in making him put his mind constantly to the question of preventing accidents" (First Wainwright Report at 7).[3]

---

[3] The Report is replete with demands that the cost of accidents be shifted to employers as a means of preventing injuries to workers: "The Commission is strongly of opinion that the

The proposed legislation was limited to hazardous occupations; it passed immediately. Almost as quickly, in a bit of *Lochner*-era jurisprudence, our Court held the "revolutionary . . . radical" statute void under the United States and New York Constitutions. Because the State made an employer "responsible to the employee for every accident in the course of employment, whether the employer is at fault or not, and whether the employee is at fault or not," "plainly constitutes a deprivation of liberty and property under the Federal and State Constitutions" (*Ives v. S. B. R. Co.*, 201 NY 271, 285, 294 [1911]. We issued the *Ives* decision on March 24, 1911. The next day, 146 workers perished in the Triangle Shirtwaist factory fire.

The Wainwright Commission went back to work, issuing its Fourth Report to the Legislature on May 3, 1911, proposing an amendment to the New York State Constitution providing that the Legislature would have the power to "make provision for the payment of compensation, with or without regard to fault, to employees injured by accidents of employment" (Wainwright Commission, Fourth Report at 6 [May 3, 1911]).[4]    On

_____

present legal system of employers' liability in force in this State (and practically everywhere else in the United States) in industrial employments is fundamentally wrong and unwise and needs radical change"; "the wise policy for the State should be to throw the burden of accident relief in dangerous trades on the industry'; "If we are right in our reasoning, the employer who has to pay, even a small amount for each serious accident for which he is in any way responsible, will be anxious to prevent accidents, and will spend money to that end"; "The best expert opinion seems to be that an analysis of the foreign figures shows a decrease of serious accidents [because of workers' compensation laws]"; "It is the opinion of a great man of the employers testifying before us on the subject that the compensation system will have the effect of making the employers more careful."

[4] For those wondering about the Court of Appeals' holding in *Ives* invoking the Federal Due Process Clause, the Wainwright Commission was advised that it could not appeal the *Ives* decision to the United States Supreme Court, but that "based on a careful study of recent decisions of the United States Supreme Court, there is good ground for expecting

November 4, 1913, voters adopted the proposed amendment by a nearly 3-to-1 margin.

The Legislature promptly reenacted a workers compensation law, this time not limited to

inherently hazardous businesses (NY Laws of 1913, ch 816).

That history—particularly the legislative emphasis on imposing liability even when

an employer is without fault in a particular case as a means of incentivizing greater safety

measures in general—is important when understanding the words of WCL §15 (7), which

is where the majority's *dicta* goes awry.  Section 15 (7) reads:

> "7. Previous disability. The fact that an employee has suffered
> previous disability or received compensation therefor shall not
> preclude him from compensation for a later injury nor preclude
> compensation for death resulting therefrom; but in determining
> compensation for the later injury or death his average weekly
> wages shall be such sum as will reasonably represent his
> earning capacity at the time of the later injury, provided,
> however, that an employee who is suffering from a
> previous disability shall not receive compensation for a later
> injury in excess of the compensation allowed for such injury
> when considered by itself and not in conjunction with the
> previous disability except as hereinafter provided in
> subdivision eight of this section"

(WCL §15 [7]).  My disagreement with the majority's *dicta* turns on the interpretation of

the "provided" clause.  The plain meaning of the "provided" clause is that each claim for

compensation must be evaluated on its own, without regard to any other claim for

that in interpreting the 'Due process' clause the court will hold that reasonable legislation
for the establishment of a compulsory compensation plan may be sustained as a legitimate
exercise of the police power, particularly where there is a provision in the Constitution of
the State enacting such legislation, which expressly authorizes this method of dealing with
industrial accidents" (Fourth Report at 3, 6-7).

compensation.[5]  The majority reads it to allow a deduction for awards made for a prior injury, at least if that injury is to the same subpart of a statutorily defined member, *e.g.*, a knee (which is a subpart of a leg, and has no separate statutory definition as a knee).  But nothing in section 15 (7) supports the majority's reading; there is no mention of any difference between awards for statutorily defined members and their subparts.

Our prior decisions also establish the error of the majority's reading of section 15 (7).  With the ink barely dry on the 1913 Workers' Compensation Statute, we decided *Schwab v Emporium Forestry Co.* (216 NY 712 [1915]).  Mr. Schwab was a forester.[6]  In 1892, his left hand was amputated.  In 1914, while employed by the Emporium Forestry Company, he lost his right hand at the wrist.  At the time, section 15 (6) contained the text of what is now section 15 (7), but it did not include the "provided" clause at the end.  The issue was whether, as a result of the 1914 accident, Mr. Schwab was "entitled to compensation for permanent total disability under subdivision 1 of section 15 of the Workmen's Compensation Law, or for compensation as for the loss of one hand under subdivision 3 of said section."  The former would have entitled him to two-thirds of his wages for life; the latter to two-thirds of his wages for 244 weeks.  We affirmed the Appellate Division's holding that Emporium was required to pay him the greater amount, as a permanent total disability.

_____

[5] There is a further reason why the "provided" clause could not be used to bar Mr. Johnson from recovery: whether you read it as I do or the majority does, it governs compensation for a "later injury"—Mr. Johnson's claim at issue here is for his *initial* injury.
[6] The facts are found only in the Appellate Division's decision (*Schwab v Emporium Forestry Co.*, 167 App Div 614 [3rd Dept 1915]), which we summarily affirmed.

As we explained in *State Industrial Commission v Newman* (222 NY 363, 366-367 [1918]), the "provided" clause was added to alter the effect of *Schwab*, which was "a hindrance to those who, having lost a hand or other member, sought to become employees under the act, because the loss of the remaining member subjected the employer to the payment of a compensation substantially greater than it would in the case the employee had had the two members." Thus, the "provided" clause cannot be read as the majority would have it—to allow for a *deduction* of a prior award from a current award—but rather exists so that an employer is not subjected to liability for a permanent total disability when that result would arise from the combination of a prior partial disability and a current partial disability. We reaffirmed that understanding of the "provided" clause in *Schurick v Bayer Co.* (272 NY 217, 219 [1936]), in which we were "chiefly concerned with the proviso at the end"—the "provided" clause of section 15 (7). We explained that "[w]hile the language of the proviso was capable of a wider application, it is reasonably clear that it was originally intended to cover only a state of facts comparable with those in the *Schwab* case" (*id*. at 220). [7]

That brings us, finally, to *Zimmerman*, and back to why it is that an injured worker can receive awards totaling more than 100% loss of use for successive injuries to an arm, leg or other body part. The plain answer is that the Workers' Compensation Law has, as a

---

[7] That said, the Legislature did not conclude that a claimant like Mr. Schwab should not receive compensation for a total disability. To the contrary, the Legislature provided that the employer would be fully liable for the injury occurring at its workplace and also created the special fund to pay claimants the difference, thereby distributing the cost across all employers rather than tagging the employer whose employee suffered his or her subsequent injury in its employment (*see* WCL § 15 [8]).

major purpose, making employers (and ultimately consumers, as the Wainwright Commission explained) liable for workplace injuries regardless of fault, so that employers will have an incentive to employ safety measures to reduce workplace injuries. Thus, although the Legislature amended section 15 (7) in response to *Schwab* to eliminate *Schwab*'s incentive for employers to avoid hiring persons with a prior disability, there is no reason to believe that the Legislature intended to reduce the incentive to avoid workplace accidents by allowing employers to obtain a discount for injuring a previously injured worker.

In *Zimmerman*, as described earlier, the claimant received an SLU award for 80% use of his left arm for a left forearm amputation caused by a workplace accident in 1924. He continued working for the same employer at his same job and, four decades later, suffered a workplace injury to his left shoulder for which he received a 50% SLU award "for loss of use of his [left] arm attributable solely to the 1967 accident" (29 NY2d at 819). The majority posits that Mr. Zimmerman was able to recover 130% of the loss of use of his left arm because hands and arms are separately enumerated statutory members, and his first award was for the loss of his hand, not a fractional loss of use of his arm. There are three problems with the majority's theory. First, as explained above, the "provided" clause's text, prior interpretations by our court, and legislative history do not support that reading. The majority has invented the "separate statutory member" out of whole cloth.

Second, the majority's theory depends on an incorrect factual claim. Contrary to the majority's assertion, the 1924 award was not for "amputation of his hand" (majority op at 10) and the 1967 award was not for "a separately enumerated member" from the prior

injury (*id*. at 10)—rather, the 1924 award was for the "left forearm" and the 1967 award was for the "left shoulder," a different subpart of the same statutory member (29 NY2d at 816). Those facts are not open to interpretation. We know definitively that the 1924 award was for the left forearm, not the left hand, because the award for the 1924 injury was for 80% loss of use of the left arm. Had the award been for the hand, the award would have equaled 78% loss of use of the left arm because, in 1924, former Workmen's Compensation Law § 15 (3) (c) provided that the number of weeks' compensation for loss of a hand was 244 weeks—that is, 78% of the 312 weeks allowed for 100% loss of use of an arm. Because the compensation actually awarded to Mr. Zimmerman was 80%, it was not for his hand as a statutorily enumerated member, but it was for a fractional use of his arm—which is exactly how *Zimmerman* characterizes it. *Zimmerman*'s holding thus definitively interprets WCL § 15 (7) to require that a current award be made as if no prior award has been made; that is what "when considered by itself and not in conjunction with the previous disability" means.

Third, *Zimmerman*'s holding that successive injuries to the same statutorily defined body member can exceed 100% is consistent with the legislative intent underpinning the enactment of WCL § 15 (7). As set forth earlier, the Workers' Compensation Law exists not merely to provide compensation to injured workers regardless of fault, but also to provide an incentive to employers to reduce workplace accidents and pass those costs on to the consumers of their products. Allowing a current award to be reduced by a prior award for an injury to the same body member reduces the incentive for employers to take measures to improve workplace safety.

The majority's *dicta* has no basis in the statutory text, no basis in the legislative history, and is foreclosed by our holding in *Zimmerman*. Its basis rests solely on a misreading of a small portion of *Hroncich v Con Edison* (21 NY3d 636 [2013])—a portion which itself is *dicta*. The majority claims the following passage in *Hroncich* "interpreted section 15 (7)" (majority op at 8):

> "Thus, the three clauses in section 15 (7) specify that (1) a previous disability does not disqualify an employee from receiving compensation benefits for a later work-related injury, or disqualify his survivors from receiving a death benefit where the later injury results in the employee's demise; (2) the measure of compensation or death benefits in this situation is the employee's earning capacity at the time of the later work-related injury, which would necessarily reflect any diminished earning capacity due to the previous disability; and (3) generally, the employee shall not receive compensation benefits in excess of those allowed for the later work-related injury considered by itself, which insures that the award is based solely on the diminished earning capacity attributable to the later injury rather than from all disabilities"

(*Hroncich*, 21 NY3d at 645). *Hroncich* then emphasizes that "[s]ection 15 (7) is simply not implicated where, as here, an employee does not suffer a disability in a compensation sense prior to a work-related injury or disablement" (*id.* at 646)—rendering the entire passage *dicta*.

More importantly, the passage does not even purport to say what the majority claims. Point (1) is a direct refutation of *Genduso*, with which both the majority and I agree. Point (2) restates the portion of section 15 (7) saying that "in determining compensation for the later injury or death his average weekly wages shall be such sum as will reasonably represent his earning capacity at the time of the later injury"—a provision

that specifies the average weekly wage rate to be used in calculating the SLU award and is neither disputed nor relevant here. Point (3) is based on the "provided" clause in section 15 (7). The majority seizes on the very last fragment of *Hroncich*'s *dicta* to conclude that "diminished earning capacity attributable to the later injury rather than from all disabilities" means that a deduction for a prior injury to the same portion of the same member should be made, but that is contrary to the statutory language and not even a fair reading of the words in *Hroncich*.

That majority asserts that the "purpose of an SLU award is to compensate for loss of earning power, rather than the time that an employee actually loses from work or the injury itself" (majority op at 6). That statement is true insofar as it goes, but "compensate for loss of earning power" does not mean a calculation designed to make the injured worker whole or avoid paying compensation when the injured worker is able to return to the same job at the same rate of pay. As we have noted, an SLU award is "independent of the time an employee actually loses from work [but instead] . . . is fixed at a statutorily prescribed number of weeks of compensation" (*Landgrebe v County of Westchester*, 57 NY2d 1, 6 [1982]). Two workers performing the same job, one 60 years old and the other 20 years old, do not have the same lifetime loss of earning power from the loss of a hand, but the SLU compensation is the same for each. Indeed, paying two-thirds of a worker's salary for 312 weeks in the case of the loss of a hand does nothing to replace wage-earning capacity once week 313 rolls around. Instead, "compensate for loss of earning power" is meant to emphasize that it is *not* anything like a tort award that would provide full recompense for the worker's actual loss: "'The compensation awarded the employee is not

such as is recoverable under the rules of damages applicable in actions founded upon negligence. It is based on loss of earning power'" (*Marhoffer v Marhoffer*, 220 NY 543, 547 [1917], quoting *Matter of Winfield v N.Y.C. & H. R. R. R. Co.*, 216 NY 284, 289 [1915]; *see also* First Wainwright Report at 7 [injured workers should "receive such prompt and certain compensation as will keep (them) and those dependent on (them) from destitution"]). Thus, some workers, like Mr. Zimmerman, will receive a substantial SLU award and be able to resume the same line of work for four decades, with no actual loss of earning power. Others will have an actual diminishment in their wages because of the injury, and their awards will run out per the schedule. Either way, the broader purposes of providing a safety net for injured workers and an incentive for employers to avoid accidents in the first place are served.

IV

As required by statute, the Workers' Compensation Board promulgates "guidelines for the evaluation of medical impairment and determination of permanency with respect to injuries which are amenable to a schedule loss of use award" (Workers' Compensation Guidelines for Determining Employment, November 22, 2017, at 2). Those guidelines are required to be "reflective of advances in modern medicine" (WCL § 15 [3] [x]). As an example, the Guidelines specify that if a worker suffers a workplace injury that requires a full or partial knee replacement, the SLU award will be at least a 35% loss of use of the leg. Under the majority's *dicta*, if a worker whose right knee was replaced suffered a

workplace accident that destroyed the prior knee replacement, requiring a second knee replacement surgery that was completely successful, the worker would receive no SLU award. That result does not comport with the language of WCL § 15 (7), *Zimmerman* or the purposes of the Workers' Compensation Law. It is also wholly irrelevant to the majority's result in either case. I would gladly have joined an opinion saying *Genduso* was wrong and remitting to the Board for further proceedings. The different route taken by the majority compels me to dissent.

For No. 29:
Order affirmed, with costs. Opinion by Judge Cannataro. Chief Judge DiFiore and Judges Rivera, Garcia, Singas and Troutman concur. Judge Wilson dissents in an opinion.

For No. 30:
Order reversed, with costs, and matter remitted to the Appellate Division, Third Department, with directions to remand to the Workers' Compensation Board for further proceedings in accordance with the opinion herein. Opinion by Judge Cannataro. Chief Judge DiFiore and Judges Rivera, Garcia, Singas and Troutman concur. Judge Wilson dissents in an opinion.

Decided April 21, 2022